IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,               )
                                        )
        v.                              )          Criminal No. 05-129
                                        )
MARK M. KAUSHANSKY,                     )
                                        )
        Defendant.                      )

## OPINION

COHILL, D.J.

    The facts giving rise to this case occurred in the larger context of the fall of the former Soviet Union and the establishment of the Russian Federation in the 1990s, the economic chaos that resulted from the transition from a centrally planned socialist economy to a market economy, the 1998 collapse of Russian financial institutions, the international efforts to up-grade Soviet nuclear reactors following the nuclear accident at Chernobyl in 1986, and the Russian nuclear research institute known as NIKIET.

    On May 5, 2005, Evgeny Adamov and Mark Kaushansky were charged with appropriating funds allocated by the United States government to improve safety at Russian nuclear facilities. The 20-count indictment charges Adamov and Kaushansky with conspiracy to commit offense against the United States, interstate transportation of stolen property, conspiracy to commit money laundering, and money laundering. The indictment further charges defendant Kaushansky with attempting to evade taxation.

    Adamov remains in Russia, outside the jurisdiction of this court. By Opinion and Order dated June 6, 2006, we denied Adamov's motion to waive his appearance at his arraignment, which would have permitted the charges against him to go forward without his presence.

    On September 25, 2006, Mark M. Kaushansky entered a plea of "guilty" to counts 5 through 13 of the indictment. Count 5 charges conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Counts 6 and 7 charge tax evasion as President of Energopool, Inc., in violation of 26 U.S.C. § 7201. Counts 7 through 11 charge tax evasion as President of Omeka,

Ltd., in violation of 26 U.S.C. § 7201.   Counts 12 and 13 charge Kaushansky with preparing or causing to be prepared and signing a false and fraudulent joint Individual Income Tax form, in violation of 26 U.S.C. § 7201.

The parties dispute the amount of tax loss for which Kaushansky should be held responsible for purposes of sentencing under Section 2T1.1 of the now-advisory United States Sentencing Guidelines.  The Government asserts that approximately $5,000,000 is attributable to Kaushansky.  The Defendant argues that this figure is less than $70,000.  To aid the Court in making this determination, we held a sentencing hearing for seven days between February 5 and February 14, 2007.

The Government presented the testimony of Internal Revenue Service ("IRS") Agent Edward C. Reiser and International IRS Agent David Peel.

Defendant called the following witnesses: Professor Richard Ericson, who testified as an expert on the Russian economy, particularly during the transition from a command socialist economy to a market economy in the run-up to the collapse of the former Soviet Union in 1991, as well as the economic instability which followed in the aftermath of that change; Dr. Terry Lash, a consultant in nuclear safety, who headed the international nuclear safety program, administered by the Department of Energy, in which NIKIET participated as one of the Russian subcontracting institutes; Professor Ted Gerber, who testified as an expert on the economic chaos in Russia during the 1990s and the effects of economic upheaval on Russian scientists and scientific institutes, including NIKIET; Dr. Sergei Bocharov, a scientist who spent 22 years at NIKIET prior to being hired by the International Atomic Energy Association ("IAEA"), an arm of the United Nations, in 2000; Dr. Hubert Schoels, an employee of the European Commission who established and managed the Commission's Moscow office, which located its offices at NIKIET, and who testified to the effect of the political and economic transition on NIKIET and other scientific institutes; and Joel Pfeffer, an attorney who provided advice to Kaushansky and Adamov regarding establishing Energopool in 1993.  Joseph Wilson, CPA, an expert in foreign tax matters, also testified for the

2

defense on a number of issues, including the U.S.-Russia Tax Treaty. Mark Kaushansky also testified extensively.

We ordered the parties to file proposed findings of fact and conclusions of law, and heard closing arguments on May 24, 2007.

We have carefully reviewed the evidence and testimony in this matter and the submissions and arguments of the parties, and now issue the following findings of fact and conclusions of law.

## FINDINGS OF FACT

We summarize the relevant facts below: [1]

### Defendants

Defendant Mark Kaushansky was born in the Ukraine, formerly a part of the Soviet Union, and lived there until his immigration to the United States in 1979 at the age of 28. He is an American citizen. He received the equivalent of a Master of Science degree in Mechanical Engineering from the Lvov Polytechnic Institute in the Ukraine and married his wife, Luba, while still residing in Ukraine. Following their immigration to the United States, the Kaushanskys lived in Cleveland, Ohio and Ann Arbor, Michigan (where Mr. Kaushansky was employed by Bechtel Power Corporation) before moving to Pittsburgh in 1985, when Kaushansky took a nuclear engineer position with Westinghouse Electric Corporation ("Westinghouse"). [Reiser, Vol. 1, pp. 65-66; Indictment, ¶ 2; Kaushansky, Vol. V, pp. 4-11.]

Co-defendant Dr. Evgeniy O. Adamov is a prominent Russian nuclear physicist who served as Director of the Russian nuclear research institute NIKIET from November 1986 to March 1998; as Russia's Minister of Atomic Energy (at Minatom) from March 1998 to March 2001; and as NIKIET's Scientific Leader from 2001 to the present. Adamov was appointed NIKIET's Director after the Chernobyl disaster and gained international acclaim for his efforts in cleaning up the Chernobyl site and redesigning the RBMK reactor to enhance its safety. [Indictment, ¶¶ 1-5;

---

[1] Unless otherwise indicated, page references are to the hearing transcript. Vol. I is testimony from 2/5/07; Vol. II , 2/6/07; Vol. III, 2/7/07; Vol. IV, 2/8/07; Vol. V, 2/12/07; Vol. VI , 2/13/07; and Vol. VII, 2/14/07.

Kaushansky, Vol. V, pp. 18-20.] He was appointed Minister of Atomic Energy by President Yeltsin, and was discharged from these duties in March 2001, by President Putin, shortly after the release of a critical report issued by the DUMA Committee on Public Corruption ("Duma Report"). [G. Ex. L; Reiser 2/6 25, 28-29]. Adamov and his wife, Olga Pintchouk, are Russian residents and citizens.

Mark Kaushansky first met Dr. Adamov in France in 1988 when Adamov made a major presentation to Western scientists regarding the Chernobyl disaster. At the time, Kaushansky was a nuclear engineer for Westinghouse living in Pittsburgh, PA. [Kaushansky, Vol. V, pp. 18-20.]

Westinghouse began to court NIKIET and Adamov for business in the early 1990s. Kaushansky was chosen by Westinghouse to serve as a translator because of his fluency in the Russian language. Adamov visited the United States and Westinghouse on subsequent occasions, and he and Kaushansky began spending more time with each other. [Reiser, Vol. I, pp. 56-58; Kaushansky, Vol. V, pp. 18-20.]

Kaushansky testified that he was fascinated by the charismatic Adamov, who eventually became his close friend and father figure. [Kaushansky, Vol. V, pp. 15-17.]

Kaushansky assisted Adamov in obtaining a social security card and a driver's license, and in opening personal bank accounts at Mellon Bank in Pittsburgh. [Reiser, Vol. I, pp. 54-56; Kaushansky, Vol. V, pp. 25-28.]

**NIKIET Institute**

NIKIET, also known as RDIPE and ENTEK, is a Russian nuclear research institute based in Moscow, which was responsible for the design of nuclear reactors used for power plants and nuclear submarines as well as other engineering applications. NIKIET designed the RBMK nuclear reactor, the reactor involved in the Chernobyl nuclear accident in 1986. [Indictment, ¶¶ 1, 4, 5; Lash, Vol. IV, pp. 75-80; Defendant Ex. 16.]

As a result of the Chernobyl disaster, international concerns increased over the long-term

4

safety of older Soviet designed nuclear power plants, particularly those plants utilizing RBMK reactors. [Indictment, ¶ 4.]

Beginning in approximately 1991, the United States and other countries began a program to provide assistance in up-grading older Soviet-designed nuclear power plant reactors operating in Russia and the former Soviet republics. [Lash, Vol. IV, p. 77-79.]

Beginning in approximately 1993, the United States and other Western nations launched an initiative, known as the "Lisbon Initiative," to promote the safety of nuclear power plants operating in Russia and other former Soviet republics. [Indictment, ¶¶ 4 and 5; Lash, Vol. IV, pp. 57-72; Defendant's Exhibit 43, B. Teitelbaum's Affidavit in Support of Extradition and Verified Complaint in Forfeiture.]

In the United States, the Lisbon Initiative was implemented through the International Nuclear Safety Program (INSP), administered by the Department of Energy (DOE). In Europe, it was implemented chiefly through a European Commission program known as Technical Assistance to the Commonwealth of Independent States (TACIS). [Indictment, ¶¶ 4-5; Defendant's Exhibit 43, B. Teitelbaum's Affidavit in Support of Extradition and Verified Complaint in Forfeiture; Lash, Vol. IV, pp. 57-61, 85-87; Bocharov, Vol. VI, pp. 53-56.]

Funds were allocated to the INSP and TACIS programs by Western governments. The INSP and TACIS then contracted with companies in the West to perform nuclear safety upgrades. These Western entities would then subcontract a portion of the work to Russian scientific research institutes like NIKIET. The vast majority of INSP and TACIS funds would remain with the Western prime contractors, with only a small portion going to the Russian subcontractors. [Lash, Vol. IV, pp. 57-70, 83-86; Schoels, Vol. VI, pp. 90-95.]

In 1996, Congress approved an appropriation of $50 million dollars per year for ten years for this program. [Lash, Vol. IV, pp. 77, 87-88].

Under both the INSP and TACIS programs, the subcontracts with Russian scientific institutes typically worked as follows:

5

- The price for a subcontract was determined by estimating the number of hours required for the Russians to complete the work and multiplying that number by an hourly rate for each category of specialists needed on the project. The hourly wage rate was based on prevailing wage rates in Russia at the time — not on prevailing wage rates in the West.

- Because the price was determined in this manner, the subcontracts had "no fat," i.e., there was little or no difference between the amount paid to the Russian subcontractor and its cost for performing the work.

- The subcontracts established a series of project milestones. Only when a particular milestone was satisfactorily completed would the subcontractor be paid the portion of the project price associated with that milestone.

- Once payment was authorized, funds would be transferred to a bank account of the Russian institute, typically an account in Europe or the United States.

[Lash, Vol. IV, pp. 57-70, 83-86; Schoels, Vol. VI, pp. 90-95; Bocharov, Vol. VI, pp. 56-60; Defendant's Appendix A, Tab 45; Reiser, Vol. VII, p. 21.]

NIKIET was one of the Russian institutes that participated as a subcontractor in nuclear safety projects funded through the INSP and TACIS programs. NIKIET's participation, however, was relatively small compared to other Russian scientific institutes. [Lash, Vol. IV, pp. 69-75; Schoels, Vol. VI, pp. 95-97, 105.]

Nikiet received payments on the nuclear safety projects, and its project managers were aware of the contract price, involved in the invoicing to customers, verified receipt of the funds, and made sure the scientists were paid. Because milestone payments were often delayed, NIKIET would work with ENERGOPOOL [*See infra p. 9*] to advance wages to the project scientists. [Bocharov, Vol. VI, pp. 55-59; Defendant's Appendix A, Tab 45 – Affidavits of Russian Project Managers.]

NIKIET also used the PAEP and DEEP [*see infra pp. 10-12*] bank accounts in the United States to receive milestone payments from Western contractors for its nuclear safety work. Most other Russian scientific institutes likewise utilized Western bank accounts to receive milestone payments in order to avoid the dysfunctional Russian financial system. [Indictment, ¶¶ 11, 12, 52;

6

Lash, Vol. IV, pp. 68-70; Schoels, Vol. VI, pp. 96-98; Defendant's Appendix A, Tab 43 – Correspondence of AUSA Bruce Teitelbaum at p. 2.]

**Russia's economic situation during the 1990s**

We find credible the testimony of Ericson, Gerber, Lash, Schoels, Bocharov, and Kaushansky as to sociological, political, financial, and economic conditions in the USSR and the Russian Federation during the relevant period.

To briefly summarize, their testimony established that beginning in the mid-1980s, the Communist party implemented a series of reforms, known as Perestroika, in an effort to invigorate the moribund Soviet economy. These reforms ultimately led to the collapse of the Soviet Union in 1991. [Ericson, Vol. IV, pp. 17-20.]

The collapse of the Soviet Union was accompanied by the disappearance of its planned economy. The leaders of the new Russian Federation quickly implemented a series of reforms aimed at creating a market system. The transition from communism to capitalism, however, was anything but smooth. The system that took root during the chaotic years following the collapse of the Soviet Union is often referred to by economists as a "transition economy." [Ericson, Vol. IV, pp. 20-27.]

Under the Soviet command economy, "all activity was prohibited unless specifically permitted." Under the transition economy, by contrast, "all activity was permitted unless specifically prohibited." Accordingly, events in Russia cannot be viewed simply in light of Western rules of law. Indeed, it was not until Putin's second term of office, after 2002, that Western concepts such as breach of fiduciary duty or regulatory schemes (anti-trust, securities, etc.) were first adopted in Russia. [Ericson, Vol. IV, pp. 29, 42-43; Gerber, Vol. IV, pp. 120-121; Lash, Vol. IV, pp. 66-71.]

During the chaotic decade of the 1990s, the Russian Federation attempted numerous policy reforms to stabilize its economy. These reforms ranged from legalization of entrepreneurial activity (speculation) and private ownership of productive property to use of a "ruble corridor" and

price stabilization. Reforms implemented during the 1990s resulted in a series of Russian

economic "plagues" including:

- Rampant inflation running as high as 200% a month;
- Exorbitant interest rates;
- Demonetization of the economy and reliance on barter transactions;
- Forced conversion of foreign currency into rubles;
- Difficulties in moving funds in and out of Russia;
- Dramatic wage arrears;
- Collapse of the banking system;
- Oppressive and overlapping taxes; and
- Increased influence of organized crime.

[Ericson, Vol. IV, pp. 20-41; 50-51; Gerber, Vol. IV, pp. 114-125; Lash, Vol. IV, pp. 63-75;

Schoels, Vol. VI, pp. 96-100; Bocharov, Vol. VI, pp. 50-55, 68-70.]

During this chaotic period, scientists and research institutes were particularly hard hit.

Statistics demonstrate the dramatic impact that the "plagues" had on scientists and the scientific

community:

- Between 1991 and 1994, Russian budget contributions to research institutes plummeted by 75%. Of the remaining balance, only 60% actually reached the institutes. Institute funding as a percentage of gross national product (GNP) dropped eight-fold.

- Prior to 1990, Soviet scientists were paid salaries which averaged approximately 12.5% above the national average. By 1992, Russian scientists' wages averaged only 64% of a decimated national wage average.

- By the mid-1990s, only 17% of scientists received salaries above the Russian poverty level.

- Annual spending on scientific literature dropped from $5 million to $500,000 during the decade of the 1990s.

- Science was a highly respected profession during the Soviet period, but polls conducted in Russia during the mid-1990s reflected that most Russians believed working as a peasant was more desirable than a scientific career.

- The number of Russian scientists plummeted from one million in 1990 to just over 400,000 in 1998.

8

[Gerber, Vol. IV, pp. 110-118.]

Scientists fortunate enough to retain a job suffered from dramatic wage arrears that typically stretched from 2-12 months or more. [Ericson, Vol. IV, pp. 32-35; Gerber, Vol. IV, pp. 112-114.]

Scientific institutes in Russia became run down, scientists lost their jobs, those with jobs were not regularly paid, and a significant brain drain occurred with scientists transferring to other occupations or leaving Russia to work as scientists abroad. [Gerber, Vol. IV, pp. 114-120, 123-125; Lash, Vol. IV, pp. 63-75; Bocharov, Vol. VI, pp. 64-68; Defendant's Appendix A, Tab 45.]

Directors of Russian research institutes were faced with these often overwhelming burdens in trying to keep their institutes afloat. Some responded with suicide or simply succumbed to the opportunity to personally benefit at the expense of the institute. Other institute directors were motivated by a desire to protect their workers and save their institutes — a paternalistic Soviet-era norm that persisted during the transition period. These so-called "good red directors" could only achieve these objectives during the chaotic 1990s through entrepreneurship and creativity. Evidence of their success would include a stable group of core scientists who received their wages on time from an institute that properly and effectively functioned using modern equipment. [Ericson, Vol. IV, pp. 28-29, 38-42, 54-55; Gerber, Vol. IV, pp. 114-127; Bocharov, Vol. VI, pp. 64-68; Schoels, Vol. VI, pp. 99-105.]

**Entities**

The Court heard much testimony about the various entities which are at the center of the Government's charges against Kaushansky. Briefly summarized, these are:

**Energopool Russia ("RFEP")**, which was formed in approximately 1990 under the law of the former Soviet Union to facilitate cooperation between the American and Soviet scientific communities. It was a not-for-profit entity with authority to open bank accounts in the United States. Adamov was RFEP's Director until 1998. [Indictment, ¶ 3; Reiser, Vol. 1, 55-65; Pfeffer, Vol. VII, pp. 7-8; Defendant Exhibit 38 at pp. MKX380112.]

9

Adamov sought Kaushansky's help in opening a bank account for RREP in the United States. [Reiser, Vol. I, pp. 54-65; Kaushansky, Vol. V, pp. 35-42; Pfeffer, Vol. VII, pp. 5-8.] Kaushansky contacted Pittsburgh lawyer Joel Pfeffer. Because of a mistaken belief that a U.S. entity had to be incorporated in order for RFEP to obtain a U.S. bank account, Pfeffer incorporated a Pennsylvania company, Energopool, Inc. [Reiser, Vol. I, pp. 54-65; Kaushansky, Vol. V, pp. 35-42; Pfeffer, Vol. VII, pp. 5-10.]

However, after reviewing RFEP's bylaws and meeting with Adamov and Kaushansky, Pfeffer concluded that RFEP could actually open a bank account in its own right, i.e., that a separate U.S. corporation was not required. Pfeffer then dissolved the unnecessary Pennsylvania corporation and obtained a tax ID number for RFEP. [Reiser, Vol. I, pp. 54-65; Kaushansky, Vol. V, pp. 35-42; Pfeffer, Vol. VII, pp. 5-16; Defendant's Appendix A, Tab 38.] The Pennsylvania corporation has no further bearing on the tax computation in question.

**Pennsylvania Energopool ("PAEP").** Utilizing the tax ID number obtained for RFEP, Kaushansky and Adamov opened the PAEP account at Mellon Bank in order to assist NIKIET with its "reciprocal accounting" [*see infra pp. 16-18*] transactions and to protect it from the Russian financial situation. [Reiser, Vol. I, pp. 54-65; Kaushansky, Vol. V, pp. 35-42; Pfeffer, Vol. VII, pp. 5-6; Defendant's Appendix A, Tab 38.]

Between 1993 and 1997, the PAEP account was used for hundreds of reciprocal accounting transactions based upon Adamov's directions to Kaushansky and his wife Luba, who served as conduits for Adamov's banking instructions. [Reiser, Vol. I, pp. 75-80, 112-117; Kaushansky, Vol. V, pp. 42-45; Defendant's Appendix A, Tab 2.]

Its role was to receive millions of dollars due NIKIET from US and foreign labs for nuclear safety projects performed by scientists at NIKIET and other Russian institutes. PAEP also received payments on contracts where NIKIET performed services for entities in Europe, Japan and South Korea, which were unrelated to the nuclear safety work. Until approximately March 1998, Adamov directed the transfer of funds from PAEP to various accounts, including entities

10

engaged in reciprocal accounting with NIKIET, as well as bank accounts of Adamov and Olga Pintchouk in the United States. RFEP filed no tax returns in the United States arising from its maintenance of the PAEP account. [Indictment, ¶¶ 11(a), 12 and 54; Reiser, Vol. 1, pp. 58-66, 75-76, 89, 104, 112-118; Reiser, Vol. III, pp. 134-140; Government Exhibit Charts 1 and 3; Defendant Exhibit 45 – Affidavits of Strelkov and Shishkin; Lash, Vol. IV, pp. 91-92; Defendant's Appendix A, Tabs 2 and 9.]

The Government asserts that PAEP was an entity which had a duty to file a Form 1120(f) tax return, which provides notice to the IRS of activity by a foreign corporate entity in the United States. The Government argues that Kaushansky's decision to fail to file the required tax returns deprived the IRS of the opportunity to correctly and properly ascertain the nature of the activity of the foreign company's bank account. The Government admits, however, that if the monies in the account had been collected and disbursed on NIKIET's behalf, "perhaps no tax consequence may have existed (.)" [ Gov.'s F&C at ¶ 8; Peel, Vol. VII, p. 146, 149].

The Government has failed to prove that the PAEP account was created to embezzle money. There is credible evidence that the PAEP account was established to avoid the Russian financial chaos and to facilitate reciprocal accounting transactions for the benefit of NIKIET and its scientists. Indeed, a DOE employee, Michael McClary, specifically told government investigators that Russian scientists were not being paid until after PAEP was used. [ *See* Reiser aff.] Other evidence establishes that, had nuclear safety funds been paid directly to NIKIET in Russia, only about 15% of the funds would have made it to NIKIET scientists who performed the contract work. [Indictment, ¶ 10; Reiser, Vol. III, pp. 116-119; Bocharov, Vol. VI, pp. 62-64; Kaushansky, Vol. V, pp. 40-51, 55-66.]

We conclude that PAEP was a bank account for RFEP and, as such, had no duty to file a tax return. [Reiser, Vol. I, pp. 58-66; Reiser, Vol. III, p. 6; Pfeffer, Vol. VII, pp. 20-21; Wilson, Vol. VII, pp. 97-106; Defendant's Appendix A, Tabs 1, 4 and 6; Exhibit 37.]

11

**Delaware Energopool ("DEEP")** is a Delaware corporation formed in 1997 which maintained a bank account at PNC Bank. The stock of DEEP was owned by the **Margene Holdings Trust ("Margene")**, an entity formed by the shareholders of OMEKA. [*See infra pp. 15-16*]. As with PAEP, DEEP's role was to receive funds payable to NIKIET for nuclear safety and other projects performed for non-Russian customers. The PAEP and DEEP accounts overlapped for approximately one year in 1997-98. PAEP became unnecessary because of changes in Russian law. [Indictment, ¶¶ 11(b), 12 and 52; Reiser, Vol. 1, pp. 70-76; Government Exhibit Chart 1; Kaushansky, Vol. V, pp. 86-87; Defendant's Appendix A, Tab 4 at MK840062.]

**OMEKA, Ltd. ("OMEKA")** is a Pennsylvania corporation formed in 1994 with initial capitalization of $10,000. OMEKA has four shareholders: Dr. Adamov and his wife, Olga Pintchouk, both Russian residents and citizens (with 60%/20% ownership of OMEKA); and Mark Kaushansky and his wife, Luba Kaushansky, both U.S. residents and citizens (with 10%/10% ownership of OMEKA). The four shareholders have also served as directors, consultants or employees of the company at various times. At various times, OMEKA had bank accounts in Pennsylvania, France and Monaco. [Indictment, ¶¶ 11(c), 23 and 26; Reiser, Vol. 1, pp. 118-123, 164-165; Kaushansky, Vol. V, pp. 68-74.]

OMEKA earned income in the United States as a result of two main endeavors. It performed services for NIKIET in the United States, such as purchase of telephones, computer equipment and vehicles, and carried out financial transactions, such as salary payments for NIKIET, for a fee ranging from 5 to 18.5% of the service or transaction price. [Reiser, Vol. I, pp. 164-165; Reiser, Vol. II, pp. 3-9; Kaushansky, Vol. V, pp. 68-75, 101-102, 165-170, Appendix A, Tabs 14 and 24.] OMEKA also managed investments. The company was a project manager over investments made by its shareholders and others. In return, it received income roughly equivalent to its reasonable and necessary expenses, such as rent, salaries and utilities. [Reiser, Vol. III, pp. 140-148; Wilson, Vol. VII, pp. 122-132, Appendix A, Tab 6.]

Adamov served as the President of OMEKA from its founding until 1997, when he began

12

to distance himself from the company for a variety of reasons, including his possible appointment to a cabinet-level position in Russia. He resigned as an officer in August of 1997 and then served as a consultant to OMEKA until his appointment as Minister in March of 1998. [Reiser, Vol. I, pp. 135; Kaushansky, Vol. V, pp. 81-86; Defendant's Appendix A, Tab 6 at MKX60014.]

Before Adamov became Minister of Atomic Energy, he selected and funded the investments that OMEKA managed. [Reiser, Vol. I, pp. 112-118; Kaushansky, Vol. V, pp. 95-101.]

While Adamov was at the Ministry, Mark Kaushansky identified and funded the investments managed by OMEKA, using either new investor funds or the principle and income earned on earlier investments. [Reiser, Vol. II, pp. 3-14; Reiser, Vol. III, pp. 30-33; Kaushansky, Vol. V, pp. 95-101.]

The primary investors, Adamov and Pintchouk, entered into contracts with OMEKA in 1995, which established OMEKA as a fiduciary for handling investor funds. The contracts provided that "neither of the parties is responsible for the other's taxes." Accordingly, the understanding was that OMEKA would not be responsible for taxes arising out of the loans it would make on the investors' behalf. [Reiser, Vol. III, pp. 143-149; Kaushansky, Vol. V, pp. 96-97; Defendant's Appendix A, Tab 6.]

Funds received from Adamov and Pintchouk were subsequently loaned to projects. The loan agreements specifically provided that, in making the loans, OMEKA was acting "on behalf of a group of investors." [Reiser, Vol. III, pp. 143-149; Kaushansky, Vol. V, pp. 96-97; Defendant's Appendix A, Tab 6.]

Adamov and Pintchouk considered the invested funds to be their own, not OMEKA's. [Defendant's Appendix A, Tab 13, pp. MKX130202-218; Wilson, Vol. VII, pp. 122-132.]

OMEKA paid tax in the United States on its service and fee income. OMEKA did not pay tax on investment income received on OMEKA managed investments which were deposited to overseas accounts. [Reiser, Vol. II, pp. 3-14; Reiser, Vol. III, pp. 141-147; Kaushansky, Vol. V,

pp. 101-102; Government's Exhibit Vol. 5, Chart 23.]

When Adamov resigned as Minister, he returned to active management in OMEKA and a dispute developed between him and Kaushansky. Adamov was angered by how the investors' funds were utilized during his absence and was upset with Kaushansky's recordkeeping. [Reiser, Vol. II, pp. 53-64; Government Exhibit, Vol. 2, Tab M; Kaushansky, Vol. V, pp. 108-111; Defendant's Appendix A, Tab 13.]

Over the ensuing sixteen months, from May of 2001 until September of 2002, hundreds of pages of e-mails were exchanged between Kaushansky and Adamov as they argued over the nature of investments, the manner in which the books were maintained, and the ownership of particular investments. [Reiser, Vol. II, pp. 53-64; Government Exhibit, Vol. 2, Tab M; Kaushansky, Vol. V, pp. 108-111; Defendant's Appendix A, Tab 13.]

These emails, along with the online accounting system maintained by Kaushansky, known as Quickbooks, and a series of cash flow statements created by Kaushansky during the e-mail dispute of 2001 and 2002, are part of the Government's evidence in this case. [Reiser, Vol. II, pp. 55-64, 152-154.]

**Aglosky International (Aglosky)** was an "off-shore" corporation founded as a travel agency in the mid-1990s. Beginning in 1997, a number of Monaco bank accounts in Aglosky's name were utilized to hold and/or receive funds for or from investment projects managed by OMEKA. [Indictment, ¶¶ 11(d) and 18; Reiser, Vol. I, pp. 130-150; Kaushansky, Vol. V, pp. 100-101.]

In 1997, Adamov and Kaushansky began to use bank accounts of Aglosky International in Monaco. Monaco bank accounts were also opened for OMEKA, and for Adamov and Kaushansky individually. The Monaco accounts were utilized as "holding tanks" for investor funds. [Indictment, ¶¶ 11(d) and 18; Reiser, Vol. I, pp. 130-150; Kaushansky, Vol. V, pp. 80-87, 100-101; Pfeffer, Vol. VII, pp. 11-12; Defendant's Appendix A. Tab 7.]

While Dr. Adamov was at the Ministry of Atomic Energy, Mark Kaushansky created

14

fictitious invoices to move the funds that OMEKA managed from the United States to Europe. Kaushansky took such steps because he didn't think it was fair that Russian investments made with Russian funds should be taxable to OMEKA in the United States. Kaushansky also believed the invoices were necessary to justify transfers of funds from the OMEKA and DEEP accounts to Aglosky. Accounts in Monaco were frozen by the Principality of Monaco in 2002. [Reiser, Vol. I, pp. 145-148; Reiser, Vol. II, pp. 109-110; Kaushansky, Vol. V, pp. 100-103.] Kaushansky also testified that he believed funds taxable in the United States would be taxable only upon return to the United States. [Kaushansky, Vol. V, pp. 100-103, 122-128.] Such a belief was in part based upon an understanding that legal tax planning allowed deferral of such income, a practice common to U.S. corporations. [Kaushansky, Vol. V, pp. 130-132; Appendix A, Tab 7.] Kaushansky did report as income and pay tax on such repatriated funds. [Reiser, Vol. IV, p. 144; Kaushansky, Vol. V, pp. 100-103.]

Accounts in Monaco were frozen by the Principality of Monaco in 2002. [Reiser, Vol. I, pp. 145-148; Reiser, Vol. II, pp. 109-110; Kaushansky, Vol. V, pp. 100-103.] An investigation is ongoing.

**Lemotech** was a partnership formed in 1997 with the same owners in the same percentages as OMEKA. **Margene** was a trust formed in 1997 to exercise ownership responsibilities of OMEKA, DEEP and other entities housed under the Lemotech/Margene umbrella. Both Lemotech and Margene were formed under Pennsylvania law and Lemotech was registered in Pennsylvania. [Reiser, Vol. 1, pp. 151-155; Kaushansky, Vol. V, pp. 81-85; Defendant's Appendix A, Tab 12.]

Dr. Adamov's Western business activity was considered controversial for a cabinet level appointee in Russia. He therefore resigned as a consultant to OMEKA and Lemotech and Margene were utilized to insulate Dr. Adamov from any claims of continued involvement in OMEKA. Dr. Adamov's U.S. holdings were placed into this "blind trust" during the time he served as Russia's Minister of Atomic Energy. [Reiser, Vol. III, pp. 38-39, 91-96; Kaushansky, Vol. V, pp. 74-75, 81-85; Defendant's Appendix A, Tab 12.]

There was credible evidence that Lemotech and Margene were established as a "blind trust" to hold Adamov's investments while he served as Minister of Atomic Energy. [Reiser, Vol. III, pp. 91-96; Kaushansky, Vol. V, pp. 80-87, 93-95; Defendant's Appendix A, Tabs 3, 12 and 28.] The Government has not proved that Lemotech and Margene were created to hide illegal activities of the other entities.

**Reciprocal Accounting**

Credible evidence convinces us that "reciprocal accounting" was used during the time of the developments in this case, and that it played a role in the events here.

To protect and provide for NIKIET scientists, Adamov established a system of "reciprocal accounting." This allowed him to get funds to NIKIET in a way that avoided the dysfunctional Russian banking system and other economic plagues. The system operated as follows:

- Russian businesses would deliver cash to NIKIET instead of depositing the cash into unstable Russian banks;

- NIKIET would utilize this cash to pay salaries and other expenses including the wages of specialists who worked on international safety projects;

- The businesses that parted with their cash in Russia were repaid with funds transferred by PAEP, DEEP or OMEKA to bank accounts of their choosing in Europe or the United States.

[Reiser, Vol. III, pp. 26-31, 114-124, 129-141; Kaushansky, Vol. V, pp. 51-66; Bocharov, Vol. VI, pp. 55-66; Defendant's Appendix A, Tabs 9 and 27.]

This system of reciprocal accounting benefitted all parties involved. NIKIET obtained cash for salary payments, a rare occurrence in Russia during the 1990s. And the businesses that sent cash to NIKIET were able to expatriate funds to Western bank accounts, thus avoiding the Russian plagues. [Reiser, Vol. II, pp. 26-31, 114-124, 129-131; Kaushansky, Vol. V, pp. 51-67; Bocharov, Vol. VI, pp. 55-66; Defendant's Appendix A, Tabs 9 and 27; Defendant's Appendix A, Tab 45 - Affidavits of Russian Project Managers.]

Dr. Sergei Bocharov, who formerly headed NIKIET's international division, testified to his

16

own use of this system. After he left NIKIET and became employed by the International Atomic

Energy Agency in Vienna, Dr. Bocharov needed to find a way to transfer approximately \$25,000 in

cash accumulated in Russia to an Austrian bank. Dr. Bocharov had his cash savings at his home in

Russia because he did not trust Russian banks. This transfer was accomplished through Dr.

Bocharov giving the cash to NIKIET in Moscow, and DEEP making a reciprocal transfer from its

U.S. account to Dr. Bocharov at a designated bank in Vienna. [Bocharov, Vol. VI, pp. 68-72.]

As a result of the reciprocal accounting system and Adamov's other efforts, NIKIET

managed to survive and flourish during the tumultuous 1990s:

- NIKIET scientists did not suffer the wage arrears common at other Russian research institutes and NIKIET was thus able to retain its core scientists;

- NIKIET's equipment was better than equipment at other Russian institutes and, unlike many institutes, its lighting and heat functioned normally.

- During the 1990s, NIKIET was able to build a new multi-story office building, an "astonishing and impressive feat" considering the state of Russian science at that time.

- NIKIET was also able to pay for expensive surgery for its employees, provide a medical clinic and recreational facilities and apartments for key employees.

- NIKIET was able to "Westernize" at a much faster rate than other institutes and actually produced marketing films to expand its client base.

[Gerber, Vol. IV, pp. 124-125; Lash, Vol. IV, pp. 72-75; Bocharov, Vol. VI, pp. 62-67; Schoels,

Vol. VI, pp. 94-105; Kaushansky, Vol. V, pp. 46-50, 75-78; Defendant's Exhibit 16; Defendant's

Appendix A, Tab 45.]

During a period from late 1996 to early 1998, the reciprocal accounting transactions

utilized to pay NIKIET scientists were supplemented by some direct payments to scientists'

accounts at Russian banks, which had begun to stabilize to some extent by that time. [Reiser, Vol.

III, pp. 114-124; Reiser, Vol. VII, pp. 53-57; Kaushansky, Vol. V, pp. 165-170.]

When Russian banks were used, the scientists would typically withdraw the funds

17

immediately after they were wired due to the continued risk of holding funds in a Russian bank account. [Kaushansky, Vol. V, pp. 165-170; Bocharov, Vol. VI, 68-70.]

This experiment in using Russian banks to supplement the reciprocal accounting process was terminated in 1998, when Russia experienced a catastrophic bank collapse. [Reiser, Vol. III, 114-124; Reiser, Vol. VII, pp. 53-57; Kaushansky, Vol. V; pp. 165-170; Defendant's Appendix A, Tab 45 – Affidavits of Russian Project Managers.]

There was no testimony to contradict Defendant's evidence that NIKIET's customers received everything they paid for, and, indeed, made payments on the subcontracts only when project milestones were satisfactorily completed. Project funds were duly received by the NIKIET project leaders and used to pay salaries and other project expenses. All work on the contracts was completed, and individuals and entities received the full benefit of their entitlements under the contracts. [Lash, Vol. IV, pp. 57-70, 83-86; Schoels, Vol. VI, pp. 90-95; Bocharov, Vol. VI, pp. 56-60; Reiser, Vol. VII, p. 21; Defendant's Appendix A, Tab 45.]

The Government has strongly argued that there is no proof of reciprocal accounting, and that the transfers of funds through the various corporate entities and accounts establish an elaborate fraudulent scheme. However, the Government has not met its burden of proof in this regard. The Government's explanation for the facts in this case is criminal conspiracy to defraud the United States; the defendant's theory provides an alternative framework, one which we find plausible while we find the other unproved. We must give the Defendant the benefit of the doubt.

The Government has argued that funds could have been skimmed, even though the work was done and scientists were paid. However, testimony established that the subcontracts NIKIET received had no fat: the subcontract price was carefully set to match the estimated cost of NIKIET's doing the work. We are not persuaded that over 60% of the funds paid into PAEP and DEEP could have been skimmed under these circumstances. [Reiser, Vol. III, pp. 124-129; Reiser, Vol. VII, p. 21; Lash, Vol. IV, pp. 57-70, 83-86; Schoels, Vol. VI, pp. 90-95; Bocharov, Vol. VI, pp. 56-60; Defendant's Appendix A, Tabs 19 and 45.]

18

**Adamov's Tenure at MINATOM; Duma Report**

In December of 1997, Mark Kaushansky was terminated by Westinghouse because he was spending too much time on matters related to Dr. Adamov. The loss of his job was personally devastating to Mr. Kaushansky. [Reiser, Vol. I, pp. 68; Kaushansky, Vol. V, pp. 87-90.]

Three months later, Adamov was appointed Minister of Atomic Energy. This placed the future of OMEKA in doubt. [Indictment, ¶ 1; Kaushansky, Vol. V, pp. 88-93.]

On March 9, 1998, Kaushansky wrote to Adamov raising numerous questions regarding if and how reciprocal accounting and the OMEKA/NIKIET relationship would continue in light of Adamov's appointment as Minister. Adamov responded with instructions, including appropriate contact personnel and, finally, instructed Kaushansky to implement the blind trust under Margene and Lemotech. [Reiser, Vol. III, pp. 97-106; Kaushansky, Vol. V, pp. 89-95; Defendant's Appendix A, Tab 4 at MKX400108.]

Mark Kaushansky operated OMEKA and DEEP while Adamov was Minister. [Indictment, ¶ 1; Reiser, Vol. III, pp. 25, 32, 67, 134-136, 144-145; Kaushansky, Vol. V, pp. 66-67, 90-95.]

Kaushansky continued the system of reciprocal accounting used by Dr. Adamov. He worked closely with the finance director of NIKIET, V.V. Prostykov, to ensure that all funds received in the United States on NIKIET projects made their way to or on behalf of NIKIET through reciprocal accounting transactions. Kaushansky maintained a detailed "balance" document which tracked each receipt by DEEP on behalf of NIKIET as well as each reciprocal payment or other transaction by DEEP that was for NIKIET's benefit. [Reiser, Vol. III, pp. 128-142; Kaushansky, Vol. V, pp. 66-70; Defendant's Appendix A, Tab 4 at MKX40141 et. seq., Tabs 9 and 27.]

We find credible Mark Kaushansky's own testimony that he believed that he was helping Adamov aid the Russian scientific community. His testimony that funds continued to reach NIKIET is corroborated by testimony that NIKIET was thriving as a result of funds flowing

19

through OMEKA:   scientists were being paid, a new building was constructed, and employees were receiving medical care.

Adamov was appointed as Minister of Atomic Energy by President Yeltsin, and reported to a number of different Prime Ministers; he was retained by President Putin in the year 2000. [Indictment, ¶ 1; Defendant's Appendix A, Tabs 26 and 28.]

In March of 2001, an unsigned document touted as an investigative report (the "Duma Report") was released by the Russian Duma (the equivalent of the House of Representatives in the United States) and the controversy that followed resulted in Adamov's resignation as the Minister of Atomic Energy in March 2001.   [Reiser, Vol. II, pp. 25-29; Kaushansky, Vol. V, pp. 106-109.]

The Attorney General of Russia investigated the allegations contained within the Duma Report and found them to be without merit.   [Kaushansky, Vol. V, pp. 108-109; Defendant's Appendix A, Tab 29.]

We are not persuaded that the Duma Report is an accurate account of Adamov's activities. It does not establish any facts relevant to the amount of money attributable to Mark Kaushansky for purposes of sentencing in this case.

After stepping down from the Ministry of Atomic Energy, Dr. Adamov returned to NIKIET as its Scientific Leader.   [Indictment, ¶ 1; Reiser, Vol. II, pp. 52-53; Kaushansky, Vol. V, pp. 109-110.]

## U.S.-Russia Tax Treaty

We find credible the unrebutted testimony of Joseph Wilson, a CPA with experience in foreign accounts and investments, as to the effect of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, June 17, 1992 ("U.S.-Russia Tax Treaty" or the "Treaty"), on the funds in this case.   The Treaty affects whether Adamov and Pintchouk owed taxes in the United States.

Olga Pintchouk, Dr. Adamov, NIKIET and RFEP are all residents of Russia for purposes of

20

the U.S.-Russia Tax Treaty. (Treaty, art. 4). Whether Russian residents would be subject to tax under U.S. domestic tax law is modified by that Treaty. I.R.C. § 894(a)(1).

## CONCLUSIONS OF LAW

The Government must establish advisory sentencing guideline factors by a preponderance of the evidence. *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006). Under the sentencing guidelines, tax loss means the loss that was the object of the offense and resulted or would have resulted (if completed) in the loss of tax revenue due to the United States Treasury. USSG § 2T1.1 (c)).

### Count 5: Conspiracy to Defraud the United States

The indictment charges Kaushansky and Adamov with what is known as a "Klein" conspiracy, which is a conspiracy to defraud the United States by obstructing the lawful function of the IRS in assessing and collecting federal income taxes. *United States v. Shoup*, 608 F.2d 950, 956 (3d Cir. 1979).

For such a conspiracy to exist, an agreed-upon objective must be to impede the IRS. *United States v. Gricco*, 277 F.3d 339, 348 (3d Cir. 2002) (citing *Ingram v. United States*, 360 U.S. 672, 679-80 (1959)). "[T]he objectives of the conspiracy may sometimes be inferred from the conduct of the participants." *Gricco*, 277 F.3d at 348. However, the government must prove that "impeding the IRS was one of the conspiracy's objects and not merely a foreseeable consequence or collateral effect." *Id.* Moreover, "the mere fact that the participants in the scheme did not report the income in question cannot reasonably be viewed as giving rise to a strong inference that the participants agreed upon this course of action." *Id.* at 349.

Tax loss associated with the conspiracy are properly attributed to each member of the conspiracy. *Gricco*, 277 F.3d at 356. However, only that loss which is "(1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake" may be

21

included when determining the amount of tax loss for the defendant's offense level. *Gricco*, 277
F.3d at 356 (quoting *United States v. Duliga*, 204 F.3d 97, 100 (3d Cir. 2000)).

Amounts "directly attributable to the fraudulent conduct of the defendant" are properly
included in the amount of loss. *Duliga*, 204 F.3d at 100.

Where the exact amount of tax loss is uncertain, the court may make a "reasonable estimate
based on the available facts." Application Note 1 U.S.S.G. § 2T1.1; *Gricco*, 277 F.3d at 356.

Mark Kaushansky has entered a plea of guilty to this count.

Olga Pintchouk, Dr. Adamov, NIKIET and RFEP are all Russian entities or residents of
Russia. Therefore, for purposes of U.S. domestic tax law, Olga Pintchouk, Dr. Adamov, NIKIET
and RFEP are all non-U.S. persons. *See* I.R.C. § 7701(a)(30). The Government has failed to
consider this when calculating any amount of tax owed, and, therefore, we are unable to determine
the amount of tax they may owe to the United States.

Olga Pintchouk, Dr. Adamov, NIKIET and RFEP also are all residents of Russia for
purposes of the U.S.-Russia Tax Treaty. [Treaty, art. 4]. Whether Russian residents would be
subject to tax under U.S. domestic tax law is modified by that Treaty. *See* I.R.C. § 894(a)(1).

The government failed to take into account the residency of Dr. Adamov, Olga Pintchouk,
NIKIET and RFEP for purposes of U.S. domestic tax law and, further, failed to take into account
the impact of the U.S.-Russia Tax Treaty on the tax loss to the United States government. [Reiser,
Vol. III, pp. 40-42; Wilson, Vol. VII, pp. 85-97, 99-110, 112-122.]

The amounts which form the basis of count 5, and for which the Government seeks to hold
Kaushansky accountable, are directly dependent on the taxes owed by these individuals, and any
such amounts cannot presently be determined. The Government's allegations regarding tax owed
by PAEP, Adamov and Pintchouk are based on the theory that they skimmed money from NIKIET
and owed tax on the skimmed funds. The defense, however, has presented an equally plausible
explanation of the facts based upon events in Russia and the use of reciprocal accounting, and we
find that testimony credible. As we have said, we must give the Defendant the benefit of the

22

doubt.

Considering all the facts in this case, the Government has not shown that Adamov and Pinchouk had unreported taxes owed to the United States of $1,442,768.57 and $293,384.20 respectively. For purposes of this sentencing, we must conclude that any amounts owed by Adamov and Pintchouk are not attributable to Kaushansky.

We take no position on whether Adamov and Olga Pinchouk overpaid their US taxes, as the defense insists they have. Adamov has been unavailable to defend or to testify in this case, and we have held that he cannot defend these claims *in abstentia*. We will not depart from that ruling.

## Tax Evasion Counts Against Mark Kaushansky

### Counts 6 and 7

Counts 6 and 7 charge Kaushansky with tax evasion as President of PAEP/Energopool, Inc., for the fiscal years ending September 30, 1999 and 2000. The indictment charges that in 1999, PAEP/Energpool reported $22,434.00 income and paid $3,365.00 tax; the government asserts that the taxable income should have been $581,757.37, and thus the tax owed was $197,797.51.

Count 7 alleges that in 2000, PAEP/Energopool reported income of $19,991.00, and paid $2,999.00 in tax. The government asserts that the taxable income was $242,891.00, and the tax owed was $77,977.49.

We conclude as a matter of law that PAEP owes no additional taxes in the United States, because it was repaying advances made in Russia, and this is not income.

PAEP was a bank account for RFEP. As such, it was not subject to U.S. tax. The United States imposes tax on persons and entities — not on bank accounts. I.R.C. §§ 1, 11, 871, and 882(b).

### Counts 8 through 11

Counts 8 through 11 charge Kaushansky with tax evasion as President of Omeka, for the

23

fiscal years ending June 30, 1999, 2000, 2001, and 2002.  The indictment charges that for 1999, Omeka reported income of $3,672.00 and paid $551.00 in tax.  The Government asserts that the taxable income was $927,714.68, and the tax owed was $315,422.99.  For 2000, Omeka reported income of $9,430.00 and paid $1,415.00 in tax; the Government asserts that the taxable income was $1,180,335.91, and the tax owed was $401,314.21.  For 2001, Omeka reported income of $16,595.00 and paid $2,489.00 in tax; the Government charges that the taxable income was $1,022,708.07, and tax owed was $347,720.74. For 2002, Omeka reported income of $10,191.00 and paid $1,529.00 in tax; the Government asserts that the taxable income was $169,394.53, and the tax owed was $49,313.87.

The Government has not met its burden of establishing a tax loss attributable to OMEKA. OMEKA was a U.S. corporation that earned fee income for services provided to NIKIET and management fees for the investments of Adamov and others that it managed.  OMEKA paid the tax due and owing on this income.

The interest income earned on the investments managed by OMEKA was not taxable to OMEKA.  That interest income was property of the individual investors on whose behalf OMEKA made the investments: Adamov, Pintchouk and Kaushansky.  This is so because OMEKA acted as a fiduciary, it acted on behalf of" a group of investors, its shareholders considered the funds to be funds belonging to the investors, and the amounts contributed by the investors bore no relationship to ownership equity

OMEKA was the investors' agent and thus did not owe tax in its own right. A corporation that holds property as an agent for its shareholders is not the owner of the property for federal tax purposes; income and losses with respect to the property are appropriately reported on shareholders' tax returns.   *Commissioner v. Bollinger*, 485 U.S. 340 (1988) .

### Counts 12 and 13

Count 12 charges Kaushansky with  preparing and signing a false and fraudulent joint

Individual Income Tax form for 1999. The indictment asserts that he reported $41,311.00 and paid $6,118.00 in tax, whereas his taxable income was $204,272.28, and the tax owed was $56,892.52. In its filings, however, the Government has indicated that Kaushansky's recomputed unreported income tax owed for 1999 was $50,774.52, and we have used this amount. [Gov.'s Chart 24; Gov.'s F&C at 70].

Count 13 charges Kaushansky with preparing and signing a false and fraudulent joint Individual Income Tax form for 2000. In that year, he reported $38,353.00 and paid $0.00 The government asserts that his taxable income was $66,044.80, and the tax owed was $12,787.00.

United States citizens owe tax on income earned anywhere in the world. *See* I.R.C. § 61 (gross income generally includes all income from whatever source derived). Mark Kaushansky failed to pay taxes on salary and capital gains from certain stock sales that he deposited to his account in Monaco. There is a tax loss to the United States as a result of Mr. Kaushansky's failure to report this income.

The tax loss in this case cannot be determined with precision and therefore the Court should make a reasonable estimate based upon the available facts. *United States v. Gricco*, 277 F.3d 339, 356 (3d Cir. 2002). Amounts "directly attributable to the fraudulent conduct of the defendant" are properly included in the amount of loss. *Duliga*, 204 F.3d at 100. Agent Ed Reiser of the IRS and Joseph Wilson, the defense expert, agree that the tax loss as a result of Mark Kaushansky's own false tax filings has a starting point of approximately $70,000. [Reiser, Vol. II, pp. 144-146 and Government Chart 24; Wilson, Vol. VII, pp. 67-70, 134-136.] [2]

The Government has not met its burden of establishing by a preponderance of the evidence that Kaushansky is responsible for more than the amounts charged in counts 12 and 13 of the indictment, which is the sum of $63,561.52. We find that $63,561.52 is attributable to Kaushansky

---

[2] In the indictment and earlier filings in this case, the government claimed that Mr. Kaushansky owed tax on an additional $200,000 he received from OMEKA (the Bear Creek transaction). Without conceding the final determination of taxability of this item, the government now agrees with the defendant that this issue should not be considered in determining the tax figure in this case. (Gov.'s F&C at ¶ 128).

25

for purposes of sentencing.

## Conclusion

Based upon the facts in this case, we conclude that a tax of loss of $63,561.52. is attributable to the defendant, Mark Kaushansky, for purposes of determining his offense level under the advisory sentencing guidelines. Kaushansky is responsible for the taxes owed at counts 12 and 13 of the indictment. At this time, the amounts charged as a tax loss to the United States as result of Adamov's conduct have not been proved, and any amounts would be purely speculative.

The Court has previously directed that a presentence report be prepared, and the Probation Officer is hereby directed to use the sum of $63,561.52 as the amount of tax loss attributable to Mark Kaushansky. An appropriate Order follows.

June 6, 2007
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior United States District Judge

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,    )
                )
**v.**                        )      **Criminal No. 05-129**
                )
**MARK M. KAUSHANSKY,**    )
                )
**Defendant.**             )

## ORDER

AND NOW, to-wit, this _6th_ day of June, 2007, for the reasons set forth in the accompanying Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that the Probation Office is directed to use the sum of $63,561.52 as the amount of tax loss attributable to Mark Kaushansky for purposes of determining his offense level.

IT IS FURTHER ORDERED that sentencing in this matter is hereby scheduled for Thursday, June 28, 2007 at 10:00 a.m.

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior United States District Judge